1
2
3
4
5          UNITED STATES DISTRICT COURT
6          NORTHERN DISTRICT OF CALIFORNIA
7
8   UNITED STATES OF AMERICA,                    No. CR-12-0635 EMC
9              Plaintiff,
                                                 **ORDER DENYING DEFENDANT'S**
10       v.                                      **MOTION TO DISMISS INDICTMENT**
11  FRANKLIN GEOVANI PARADA-BAÑOS,               **(Docket No. 11)**
12             Defendant.
    _____/
13
14
15                    I.    <u>INTRODUCTION</u>
16          Defendant Franklin Geovani Parada-Baños is charged with violation of 8 U.S.C. § 1326 ("§
17  1326"), which provides criminal penalties for reentry of certain removed immigrants, as a result of
18  his returning to the United States after being deported in 2003.  Defendant seeks dismissal of the
19  indictment on the grounds that he was denied due process in his initial deportation proceeding
20  because (1) the immigration judge ("IJ") neglected to inform him of his eligibility for deferral of
21  removal under the Convention Against Torture ("CAT deferral"); and (2) his attorney provided
22  ineffective assistance of counsel by failing to advise him of his eligibility for CAT deferral or
23  adequately investigate his case.  Defendant argues that he would have been eligible for CAT deferral
24  because of gang violence in his home country, El Salvador.
25          For the reasons stated herein, the Court **DENIES** Defendant's motion to dismiss the
26  indictment.
27  ///
28  ///

## II. FACTUAL & PROCEDURAL BACKGROUND

A.    Defendant's Upbringing in El Salvador

Defendant was born in El Salvador on August 10, 1970.  Decl. of Rita Bosworth ("Bosworth Decl.") Ex. A (Decl. of Franklin Geovani Parada-Baños ["Parada Decl."]), Docket No. 12, ¶ 2.  In 1980, civil war broke out in El Salvador between the government and the Farabundo Marti National Liberation Front (FMLN), a guerrilla group.  *Id.* ¶ 3.  Defendant was swept up in the conflict.  For example, when Defendant was fourteen years old, he was mistaken for a guerrilla by the military and, as a result, tied to a tree with rope, blindfolded, beaten with shoots of bamboo, and interrogated for an hour.  *Id.* ¶ 4.  Shortly thereafter, Defendant was accosted by guerrillas, who approached him in a coffee field, put a gun to his head, told him they were going to kill him with a hand grenade, and hit him in the back of the head with sticks.  *Id.* ¶ 5.

In 1984, Defendant was forcefully recruited to the military and taken to a city called Santa Ana to be trained.  *Id.* ¶ 6.  Defendant was told that, if he deserted, he or his family would be killed. *Id.*  After a few months in the military, Defendant was given seventy-two hours of leave to visit his family.  *Id.* ¶ 7.  At the end of his leave, Defendant decided not to go back to the military, instead proceeding to hide with relatives and amidst the crowd in the city of San Salvador.  *Id.*  At one point, Defendant returned to visit his family, only to learn that one of his former military instructors had been looking for him, telling everyone that Defendant was an "old friend."  *Id.* ¶ 8.

The civil war in El Salvador ended in 1992.  Bosworth Decl. Ex. N (Decl. of Melissa Martinelli ["Martinelli Decl."]) ¶ 10.  Yet, Defendant's family and friends told him prior to his deportation in 2003 that the government was still punishing those people who deserted, engaging in a "cleansing campaign" such that anyone who deserted from the military or the guerrillas during the civil war would be killed.  Parada Decl. ¶ 10.

Defendant learned prior to 2003 that gang violence in El Salvador was on the rise and that one of his cousins was killed by gangs in 2000.  *Id.*  Defendant stated that this cousin was killed for "fail[ing] to meet the demands of the gang."  *Id.* ¶ 20.  A supplementary declaration provided by Defendant's sister, however, indicates that this cousin was killed for courting a gang member's girlfriend.  Declaration of Cindy Rivera ¶ 4 (Docket No. 25-1).  The police were aware of the

1    murder, and the murderer's identity was widely known, but the police did not investigate the murder

2    because they are afraid of retaliation by the gang, and because there are corrupt, gang-affiliated

3    individuals within the police department.  Rivera Decl. ¶ 4-6.

4    B.      Defendant's Immigration to the United States and Subsequent Criminal Conviction

5            In 1990, Defendant came to the United States to join his mother, who had already emigrated

6    from El Salvador.  *Id.* ¶ 9.  Defendant was ultimately granted employment authorization on June 29,

7    1991 and temporary protected status around that time.  *See* Bosworth Decl. Exs. F, Q.  Defendant

8    applied for asylum on September 5, 1995, although it is unclear whether this application was ever

9    fully adjudicated.  *See* Bosworth Decl. Ex. I; Def.'s Mot. to Dismiss Indictment ("Mot."), Docket

10   No. 11, at 5:14.

11           On July 27, 1999, Defendant was convicted of violating California Penal Code section

12   288(a), lewd and lascivious acts with a person under the age of fourteen, and California Penal Code

13   section 286(c)(1), sodomy with a person under the age of fourteen, based on a crime committed in

14   1997, receiving sentences of three and two years, respectively.  Bosworth Decl. Ex. P; Decl. of J.

15   Mark Kang ("Kang Decl.") Ex. 2, Docket No. 14.

16   C.      Defendant's Deportation Proceedings

17           Following Defendant's conviction, the Immigration and Naturalization Service ("INS")

18   initiated removal proceedings against Defendant on February 20, 2003.  Bosworth Decl. Ex. J; Kang

19   Decl. Ex. 1.  Defendant had four hearings in front of IJ Michael Yamaguchi over the course of his

20   removal proceedings, from March 2003 to June 2003.  *See* Bosworth Decl. Ex. L (transcript of

21   hearings); Kang Decl. Ex. 3 (audio recording of hearings).  At the first hearing, Defendant indicated

22   that his family was in the process of hiring a new lawyer, leading the IJ to continue his case for two

23   weeks.  Bosworth Decl. Ex. L at 2.  At the subsequent hearing, on April 9, 2003, Defendant

24   informed the IJ that his family had hired a lawyer, but the lawyer was not present at the hearing and

25   Defendant did not know who the lawyer was, leading the IJ to continue the hearing to April 14,

26   2003.  *Id.* at 4-5.  The attorney his family had hired was Stephen Shaiken.  Parada Decl. ¶ 14.

27

28

3

On April 14, 2003, Defendant was represented by an attorney, Parmeet Randhawa,[1] who indicated that "Mr. Shaiken was actually going to ask for a continuance. Um, they're going [to] be requesting deffer[al] under CAT." Bosworth Decl. Ex. L at 6-7. The IJ later told Randhawa to "[t]ell Mr. Shaiken that [the IJ would] expect that when [Mr. Shaiken] appear[ed] on June 11 that he [would] have an I-589 to be filed so that [they could] set a hearing date for [Defendant's] case." *Id.* at 9. The IJ explained to Defendant that Mr. Shaiken would be present at Defendant's hearing on June 11, 2003

> [a]nd at that time, you're going to file . . . an I-589, an application for deferral under the Convention. In other words, you have a fear of returning to your home country, and he is going to file an application on your behalf. And then I will, in turn, set a hearing date for your case.

*Id.* at 10-11.

At Defendant's subsequent hearing on June 11, 2003, Shaiken appeared on his behalf. *Id.* at 11-14. Prior to the hearing, Shaiken had told Defendant "that [he] was not eligible for any form of relief from deportation" because of his aggravated felony conviction and that "[Defendant] was wasting [his] time by waiting in jail." Parada Decl. ¶ 15. At the hearing, Shaiken indicated that Defendant "admit[ted] the allegations [and] concede[d] deportability . . . ." Bosworth Decl. Ex. L at 12. Someone[2] then waived Defendant's right to appeal. *Id.* at 13. About one month later, Defendant was deported to El Salvador. Parada Decl. ¶ 18.

D.   Defendant's Experience in El Salvador After Deportation

Defendant remained in El Salvador from 2003 until 2008. *Id.* During this time, he hid in a small town and worked for his family's business. *Id.* He was regularly extorted by members of two notorious gangs – Mara Salvatrucha, also known as "MS13," and 18th Street, also known as "Mara 18" – for a large portion of his earnings. *Id.* In late 2007, Defendant was no longer able to pay such rent to the gangs, resulting in threats against his life, his being severely beaten on multiple

---

[1] Although the transcript of the hearing indicates that Defendant was represented by "Ms. Mangala," both parties agree that he was actually represented by Parmeet Randhawa. *See* Bosworth Decl. Ex. L at 5-11; Mot. 6 n.3; U.S. Opp'n to Mot. ("Opp'n"), Docket No. 13, at 2:21-22.

[2] The transcript submitted by Defendant indicates that a "Male Voice" waived his right to appeal. *See* Bosworth Decl. Ex. L at 13.

occasions, and his being shot at by six gang members. *Id.* ¶ 19. He ultimately fled his home and returned to the US, fearing for his life. *Id.* Several of his relatives had been murdered by gangs for failing to meet gang demands. *Id.* ¶ 20.

E. Current Procedural History

In 2012, Defendant was picked up by Immigration and Customs Enforcement ("ICE") in the US. *Id.* ¶ 21. An asylum officer determined that, while Defendant's story was credible, he did not have a reasonable fear of returning to El Salvador. *Id.* An IJ ultimately agreed with the asylum officer on review. *Id.* Defendant filed a petition for review of the IJ's decision with the Ninth Circuit on July 12, 2012, despite his immigration counsel having counseled him that he would be at risk of facing additional criminal charges for reentry if he petitioned for review. Martinelli Decl. ¶¶ 23-24.

The grand jury indictment in this case was filed on August 23, 2012. *See* Indictment, Docket No. 1. On January 16, 2013, the Ninth Circuit remanded Defendant's immigration case to the IJ for a new reasonable fear hearing, which has yet to be scheduled. Bosworth Decl. Ex. R. On February 6, 2013, Defendant filed the current motion to dismiss the indictment in his case, seeking to collaterally attack his original deportation pursuant to 8 U.S.C. § 1326(d). *See* Docket No. 11.

## III.  DISCUSSION

A. Legal Standard

Courts regularly decide § 1326(d) collateral attacks through motions to dismiss an indictment. *See, e.g.*, *U.S. v. Valdavinos-Torres*, 704 F.3d 679, 685 (9th Cir. 2012); *U.S. v. Calderon-Segura*, 512 F.3d 1104, 1107 (9th Cir. 2008). Section 1326(d) provides that an alien charged with illegal reentry may collaterally attack his underlying deportation order if he demonstrates "(1) [he] exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived [him] of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair." "An underlying removal order is fundamentally unfair if (1) an alien's due process rights were violated by defects in the underlying deportation proceeding, and (2) he suffered

prejudice as a result of the defects." *U.S. v. Pallares-Galan*, 359 F.3d 1088, 1095 (9th Cir. 2004) (quotation marks and citation omitted).

B.    Entry of Order Fundamentally Unfair

The parties focus their argument on the third prong of the § 1326(d) analysis, which asks whether the underlying deportation order was fundamentally unfair based on due process violations and resulting prejudice.

1.    Due Process Violations

Defendant contends that there were two due process violations in the underlying deportation proceeding:  (1) the IJ neglected to inform Defendant of his eligibility for CAT deferral; and (2) Defendant received ineffective assistance of counsel.

a.    IJ Neglected to Inform Defendant of Eligibility for CAT Deferral

Immigration regulations require an IJ to inform an individual in deportation proceedings of his "apparent eligibility" for relief from deportation.  *U.S. v. Lopez-Velasquez*, 629 F.3d 894, 896 (9th Cir. 2010) (en banc) (citing 8 C.F.R. § 1240.11(a)(2)).  The Ninth Circuit "ha[s] interpreted 'apparent eligibility' to mean where the record, fairly reviewed by an individual who is intimately familiar with the immigration laws – as IJs no doubt are – raises a reasonable possibility that the petitioner may be eligible for relief."  *Id.* (quotation marks and citation omitted).  "[F]ailure to so advise an alien violates due process and can serve as the basis for a collateral attack to a deportation order where . . . the order is used as the predicate for an illegal reentry charge under § 1326."  *Id.* at 897.  "On the other hand, the IJ is not required to advise an alien of possible relief when there is no factual basis for relief in the record."  *Id.* at 900.  "IJs are not expected to be clairvoyant; the record before them must fairly raise the issue:  Until the alien himself or some other person puts information before the judge that makes such eligibility 'apparent,' this duty does not come into play."  *Id.* (quotation marks and citation omitted).

Here, the parties primarily dispute two issues:  (1) whether the IJ met his burden of informing Defendant of his apparent eligibility; and (2) whether Defendant was apparently eligible for relief.

1    The IJ did arguably discharge his duty to inform Defendant of such eligibility by telling

2 Defendant on April 14, 2003 that Mr. Shaiken would be present at Defendant's hearing on June 11,

3 2003,

> [a]nd at that time, you're going to file . . . an I-589, an application for
> deferral under the Convention.  In other words, you have a fear of
> returning to your home country, and he is going to file an application
> on your behalf.  And then I will, in turn, set a hearing date for your
> case.

Bosworth Decl. Ex. L at 10-11.  Defendant argues that the IJ's failure to "even ask Mr. Parada if he

had a fear of returning to his country, let alone advise him of eligibility for relief" at his June 11,

2003 hearing violated the IJ's duty to inform Defendant of his apparent eligibility for relief.  *See*

Def.'s Mot. 15-16.  However, Defendant does not point to any law requiring that an IJ repeatedly

raise an individual's apparent eligibility for relief at each hearing in the deportation proceedings.

Arguably, the IJ's statement at the April 14, 2003 hearing did not suffice to "inform" Defendant of

his apparent eligibility for relief under CAT, instead only informing Defendant that his attorney

intended to file for CAT relief and neglecting to explain how that relief functioned.  However, the

Court need not resolve this issue because in any event, Defendant has not demonstrated that there

was any factual basis on the record fairly raising his eligibility for CAT deferral.

As there is no evidence before the Court that there was a "factual basis for relief in the

record" that would have triggered the IJ's obligation to inform Defendant of his apparent eligibility

for such relief.  *See Lopez-Velasquez*, 629 F.3d at 900.  Defendant has submitted various evidence in

support of his motion to dismiss the indictment discussing the state of El Salvador and Defendant's

earlier asylum application.  *See* Mot. 14-15 (explaining record).  However, Defendant has not

demonstrated that any of this evidence was on the record in his deportation proceedings.  For

example, Defendant submits evidence that his cousin was killed by gangs in El Salvador.  *See*

Parada Decl. ¶ 10; Martinelli Decl. ¶ 22.  However, there is no indication that this evidence was

before the IJ in 2003.  At best, Defendant can point to his 1995 asylum application, which may or

may not have been on the record at his deportation proceedings, but, regardless, only states that he

did not want to go back to El Salvador because of the "FMLN guerrillas group."  *See* Bosworth

Decl. Ex. I.  There is no indication before the Court why Defendant's fear in 1995 of guerrillas

associated with the civil war, which ended in 1992, would have provided any factual basis for relief from deportation years later, in 2003.

Thus, Defendant has not set forth a due process violation based on the IJ's failure to inform Defendant of his apparent eligibility for CAT deferral.

### b. Ineffective Assistance of Counsel

Alternatively, Defendant argues that his due process rights were violated as a result of ineffective assistance of counsel. *See* Mot. 16-20. The parties primarily dispute (1) whether ineffective assistance of counsel may serve as grounds for a collateral attack of an underlying deportation proceeding; and, if so, (2) whether Shaiken's representation of Defendant constituted ineffective assistance of counsel. *See* Mot. 16-20; Opp'n 7-10; Reply 5-8.

### i. Permissibility of Collateral Attack Based on Ineffective Assistance

It is undisputed that ineffective assistance of counsel in a removal proceeding may constitute a due process violation where "the alien was prevented from reasonably presenting his case." *Mohammed v. Gonzales*, 400 F.3d 785, 793 (9th Cir. 2005) (quotation marks and citation omitted); *see also Nehad v. Mukasey*, 535 F.3d 962, 967 (9th Cir. 2008). The Government cites *U.S. v. Gutierrez-Cervantez*, 132 F.3d 460 (9th Cir. 1998), for the proposition that, regardless of whether ineffective assistance of counsel constitutes a due process violation, it may not serve as grounds for a § 1326(d) collateral attack. *See* Opp'n 9-10. However, in *Gutierrez-Cervantez*, the defendant sought to collaterally attack prior felony convictions that were the basis for his deportation, not the underlying deportation procedure. *Id.* at 462. Courts have recognized that, even though a party may not collaterally attack an underlying criminal proceeding under § 1326(d), he or she may still collaterally attack the resulting removal proceeding on the basis of ineffective assistance of counsel. *See U.S. v. Perez*, 330 F.3d 97, 104 (2d Cir. 2003); *cf. U.S. v. Aguilar-Lopez*, No. C-09-6045 FVS, 2010 WL 3021876, at *3 (E.D. Wash. July 29, 2010) (§ 1326 "explicitly covers due process concerns in the deportation hearing following the state conviction, not the state conviction itself"); *U.S. v. Adame-Orozco*, 607 F.3d 647, 650 n.3 (10th Cir. 2010) ("§ 1326(d) permits a court in an illegal reentry case to reexamine the validity of the alien's deportation proceedings-just not a conviction that might've led to those proceedings").

United States District Court

For the Northern District of California

In addition, the Government points to *Custis v. U.S.*, 511 U.S. 485, 496 (1994), for the proposition that collateral attacks related to problems with counsel may only be brought where an individual is completely deprived of his right to counsel, but neglects to point out that *Custis*, which was not a § 1326 case, only reached this conclusion after pointing out that the law at issue, a sentence enhancement statute, did not specifically authorize collateral attacks. Unlike the statute in *Custis*, § 1326(d) explicitly authorizes collateral attacks of underlying deportation proceedings. As both *Gutierrez-Cervantez* and *Custis* are distinguishable, the Court finds that ineffective assistance of counsel may serve as grounds for a § 1326(d) collateral attack of an underlying removal proceeding.

ii.    <u>Ineffective Assistance</u>

Next, the parties dispute whether Shaiken's representation of Defendant actually constituted ineffective assistance of counsel. Defendant's evidence supporting the alleged ineffective assistance of counsel claim primarily boils down to one paragraph in Defendant's declaration, in which he indicates that

> [o]n June 11, I appeared in court for the fourth time. Before court, Mr. Shaiken told me that I was not eligible for any form of relief from deportation, and he told me I was wasting my time by waiting in jail. He never told me about protection under the Convention Against Torture ("CAT") or that I might be able to apply for deferred removal under CAT. He never asked me any questions about my fear of returning to El Salvador to even see if I might be eligible for such a defense. He did not ask me about my asylum application. He simply told me that because of my aggravated felony conviction, I was not eligible for any relief from removal and that I should agree to be deported as quickly as possible.

Parada Decl. ¶ 15.[3]

The Government contests Defendant's characterization of events by submitting a declaration by Mr. Shaiken detailing his general practice of always advising his clients that they may file for CAT deferral and suggesting that he would have done the same for Defendant. *See* Kang Decl. Ex.

---

[3] Defendant also suggests that Shaiken's apparent confusion at the hearing regarding whether Defendant was from Guatemala or El Salvador is indicative of ineffective assistance of counsel. *See* Mot. 19:12-14. However, Defendant has not suggested how this act prejudiced him in any way. Moreover, Defendant mischaracterizes this testimony, as Shaiken actually indicated that Defendant "designates . . . Guatemala," presumably as the country to be deported to, not that Defendant actually was from Guatemala. *See* Bosworth Decl. Ex. L at 12.

4 ¶¶ 6-7, 13, 15-18.  However, Mr. Shaiken does not specifically recall Defendant or whether he in fact communicated information about CAT deferral to Defendant.  *See id.* ¶ 11.  Given Defendant's specific recollection that Mr. Shaiken did not share this information with him, Defendant's version of events is more persuasive.

Taking Defendant's version of events as true, Mr. Shaiken provided ineffective assistance of counsel, as he entirely failed to explore the possibility of CAT deferral with Defendant, instead indicating, without investigation, that Defendant "was not eligible for any relief from removal" because of his aggravated felony conviction.  *See* Parada Decl. ¶ 15.  However, as discussed below with respect to prejudice, Defendant did not have a plausible claim for CAT deferral, and thus any failure to discuss CAT deferral could not have resulted in a due process violation.

    2.   <u>Prejudice</u>

Regardless of whether the IJ violated his duty to inform Defendant of his apparent eligibility for CAT relief or Mr. Shaiken provided ineffective assistance of counsel, Defendant must still demonstrate prejudice as a result of these alleged due process violations.  He has not done so.

    a.   <u>Legal Standard</u>

To establish prejudice, a defendant "does not have to show that he actually would have been granted relief."  *U.S. v. Ubaldo-Figueroa*, 364 F.3d 1042, 1050 (9th Cir. 2004).  Rather, "he must only show that he had a 'plausible' ground for relief from deportation."  *Id.* (citation omitted).  "[E]stablishing 'plausibility' requires more than establishing a mere 'possibility.'"  *U.S. v. Barajas-Alvarado*, 655 F.3d 1077, 1089 (9th Cir. 2011).  "In other words, to show 'plausible grounds' for relief, an alien must show that, in light of the factors relevant to the form of relief being sought, and based on the unique circumstances of the alien's own case, it was plausible (not merely conceivable) that the IJ would have exercised his discretion in the alien's favor."  *Id.* (quotation marks, alterations, and citation omitted).[4]

_____

[4] Defendant cites *U.S. v. Muro-Inclan*, 249 F.3d 1180, 1184 (9th Cir. 2001), for the proposition that Defendant need not show there was a reasonable probability he would have been granted relief.  *See* Mot. 20:14-18; Def.'s Supp. Br., Docket No. 22, at 6:4-7.  However, *Muro-Inclan* does not include this definition of plausibility, but rather simply indicates that a defendant need not show he "actually would have been granted relief."  *See Muro-Inclan*, 249 F.3d at 1184.

1    Thus, Defendant needs to show that he had a plausible CAT deferral claim in 2003. In order

2    to be eligible CAT deferral, an individual must "establish that it is more likely than not that he or she

3    would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2).

4    "Torture" is defined as

5              any act by which severe pain or suffering, whether physical or mental,
              is intentionally inflicted on a person for such purposes as obtaining

6              from him or her or a third person information or a confession,
              punishing him or her for an act he or she or a third person has

7              committed or is suspected of having committed, or intimidating or
              coercing him or her or a third person, or for any reason based on

8              discrimination of any kind, *when such pain or suffering is inflicted by
              or at the instigation of or with the consent or acquiescence of a public*

9              *official or other person acting in an official capacity.*

10   8 C.F.R. § 1208.18(a)(1) (emphasis added). "Acquiescence of a public official requires that the

11   public official, prior to the activity constituting torture, have awareness of such activity and

12   thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. §

13   1208.18(a)(7). "Government acquiescence does not require actual knowledge or willful acceptance

14   of torture; awareness and willful blindness will suffice." *Aguilar-Ramos v. Holder*, 594 F.3d 701,

15   705-06 (9th Cir. 2010).

16              b.    Grounds for CAT Deferral

17   Defendant submits several arguments for why he would have been eligible for CAT deferral,

18   including that (1) he "submitted an asylum application in 1995 in which he expressed fear of

19   persecution upon returning to El Salvador and indicated that he had been persecuted in the past"; (2)

20   he "had been hiding for years before he came to the United States because he was afraid of being

21   killed, clearly demonstrating that he could not relocate to a part of the country where he would not

22   be tortured"; (3) "the date of [Defendant's] entry into the United States, January 29, 1990, was, as a

23   matter of fact, during the Salvadoran civil war, and it was also the period of time covered by the

24   ABC lawsuit," which lawsuit resulted in a settlement that rendered him eligible to apply for asylum;

25   (4) Defendant's "cousin was killed in 2000 as a result of elevated gang violence in El Salvador"; (5)

26   "the IJ himself was told that [Defendant] was going to file a claim for deferral of removal under

27   CAT, yet he still failed to advise [Defendant] of his eligibility or inquire as to whether he was afraid

28   to return"; and (6) "there was already evidence in the record that would support a finding of relief

under CAT, but had [Defendant] been given the opportunity to develop the record even more, there is no question that it was at least plausible that he would receive deferral of removal under CAT." Mot. 14-15.

As for Defendant's first three arguments, all reflect conditions in El Salvador well before Defendant's 2003 removal proceeding, which itself was over ten years after the cessation of the civil war in El Salvador. In order to prevail on these theories, Defendant would need to submit evidence showing it was plausible that an IJ would have found it more likely than not that Defendant would be subjected to torture in 2003 notwithstanding the changed circumstances in El Salvador. He has not done so, instead citing only his own declaration regarding what occurred to him during the course of the civil war in the 1980s and an asylum application prepared in 1995. *See id.* at 14-15 (citing Parada Decl. ¶¶ 7-8; Bosworth Decl. Ex. I). Defendant submits no evidence or argument regarding why he would have been eligible for asylum under the ABC settlement, and his immigration attorney even suggests that approval rates for asylum applications were in the realm of twenty-five percent. *See* Martinelli Decl. ¶ 10. To the extent Defendant expressed fear of reprisals as a military deserter, there is no evidence on record that such reprisals were occurring in 2003. In fact, the only evidence before the Court regarding country conditions in 2003, the Department of State Human Rights Report for 2003, does not mention any such reprisals. *See* Kang Decl. Ex. 5.

Defendant's fifth and sixth arguments do not speak to Defendant's eligibility for CAT deferral. The fifth argument, regarding the IJ's failure to advise Defendant of his eligibility or to inquire as to whether Defendant was afraid to return to El Salvador, is just the alleged underlying due process violation. The sixth argument, regarding the evidence on the record and the opportunity to develop the record, does not set forth how any development in the record would have supported his eligibility for deferral. This argument, too, speaks more to an alleged due process violation – inability to develop the record – than to the prejudice resulting therefrom.

c.     <u>Gang Violence</u>

Thus, Defendant is left with one argument for prejudice: that, because his cousin was killed by gangs in 2000, he would have been eligible for deferral of removal under CAT in 2000. *See* Mot. 15:6-7. Doing so presents two interconnected hurdles; Defendant must demonstrate that, "based on

the unique circumstances of [his] own case," it is plausible that an IJ would have found it more likely than not in 2003 that: (1) Defendant would have been subjected to torture if returned to El Salvador; and (2) said torture would have been "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *See Barajas-Alvarado*, 655 F.3d at 1089; 8 C.F.R. § 1208.18(a)(1).

                i.    <u>Defendant's Own Likelihood of Being Tortured</u>

With respect to the first hurdle, Defendant suggests that he was at a heightened risk of gang violence in 2003 because (1) his cousin was killed by gangs; and (2) because long-term residents of the US, such as Defendant, are at heightened risk of extortion. *See* Mot. 15; Reply 10-11; Def.'s Supp. Br. 2-3. To support the first rationale, Defendant initially relied entirely on two declarations by his expert witness, Dr. Thomas Boerman, submitted with his motion and reply brief, wherein he indicates that threats by gangs "typically generalize to other members of a targeted individual's family . . . ." *See* Bosworth Decl. Ex. O ("Boerman 1st Decl."), Docket No. 12-15, ¶ 44; Reply Ex. S ("Boerman 2d Decl."), Docket No. 19-1, ¶ 21.

However, Defendant does not provide any details about his cousin's death to suggest why he, specifically, would be at a heightened risk. He states that his cousin was killed by gangs in 2000, but does not provide any details about the circumstances surrounding his cousin's death beyond indicating that he was "murdered for failure to pay rent . . . ." Parada Decl. ¶ 20. Dr. Boerman's declarations do not provide sufficient details to link Defendant to the threat faced by family members of individuals targeted by gangs for failure to pay rent. Presumably, the threat faced by family members is diminished the further and further away the family member is in relation to the individual targeted by gangs. Here, one of Defendant's immediate family members was not killed, but rather his cousin, yet there is no discussion of how the proximity of different family members affects the threat of gang violence.

After the Court gave Defendant the opportunity to submit supplemental information about the facts surrounding his cousin's murder, Defendant submitted a declaration from his sister Cindy Rivera, who provided information that she had in turn received from Defendant's aunt Martina

Baños, the mother of the murdered cousin.[5]  Rivera Decl. ¶ 2.  With regards to the 2000 murder of

Defendant's cousin, this declaration contradicts Defendant's earlier-submitted declaration,

indicating that the cousin was murdered not for failure to pay rent, but for courting a gang member's

girlfriend.  *Id.* ¶ 4.  Rivera also indicates that two more of Defendant's cousins – siblings to the

cousin who was murdered in 2000 – were murdered by the same gang in 2004 and 2010.  *Id.* ¶¶ 8-

10.  The first was murdered shortly after revealing that he knew the identity of the gang member

who had murdered his brother in 2000, and the second was murdered with her partner after failing to

comply with gang members' demands for rent.  *Id.*

　　　　This supplemental information is still insufficient to establish a nexus between the murder of

these cousins and Defendant's likelihood of experiencing torture upon return to El Salvador as of the

time of the 2003 hearing before the IJ.  The two latter murders occurred after the hearing, and thus

have no bearing on whether Defendant would have been able to meet his burden at the time of the

hearing before the IJ.  The fact that the cousins murdered were all siblings undermines the argument

that Defendant is closely associated enough with them that he would also face significant risk.

There is no evidence that anyone outside the immediate family of the murdered cousin had been

killed or tortured by the gant.  Indeed, it appears that Defendant's aunt still lives in El Salvador, a

fact which weakens his CAT claim.  *See Santos-Lemus v. Mukasey*, 542 F.3d 738, 747-48 (9th Cir.

2008) (finding that the fact that an applicant's mother remained unharmed in his country of origin

undermined CAT claim).  Additionally, according to Rivera, each of the three siblings was murdered

for a different reason.  Defendant provides no information about where these events took place, or

whether he would necessarily live in the area where the murders took place upon his return to El

Salvador.  Nor does he provide information about any gang threats that are specific to him, or threats

expressed towards the family more generally.

---

[5]  As the government points out, this declaration contains multiple hearsay.  Defendant apparently did not get a declaration from his aunt because she does not speak English, and due to budget cuts related to sequestration, Defendant's counsel was unable to secure approval for the funds for translation services.  Docket No. 25 at 2 n.2.  In any case, as discussed above, the facts contained in the Rivera declaration are insufficient to show that it is plausible that an IJ would have found it more likely than not that he would be tortured upon return to El Salvador.

1    Regarding the second rationale, the risk of long-term US residents being targeted by gangs,

2    Defendant again provides little detail, instead relying on Dr. Boerman's conclusion that individuals

3    who have spent time in the US are at a heightened risk of extortion.  He does not state that

4    individuals are subject to a heightened risk of torture; that heightened risk may only be inferred by

5    assuming that individuals may resist extortion and then be tortured as a result of their resistance.

6    Moreover, under this logic, presumably every potential Salvadoran deportee who had spent a

7    reasonable amount of time in the US would be at a heightened risk.  Yet, Defendant must show his

8    eligibility "based on the unique circumstances of [his] own case."  *See Barajas-Alvarado*, 655 F.3d

9    at 1089.

10    Ultimately, Defendant's own expert does not conclude that it would have been more likely

11    than not in 2003 that Defendant would be subjected to torture if returned to El Salvador.  While he

12    acknowledges that "the standard for the Convention Against Torture is that it is more likely than not

13    that a person will be tortured if returned to the country of removal," Dr. Boerman ultimately

14    concludes that"a long-term resident of the U.S. returning to El Salvador whose family had been

15    previously harmed would have been *at risk* for egregious physical harm and death . . . ."  Boerman

16    2d Decl. ¶¶ 26-27 (emphasis added).  With full awareness that it must have been "more likely than

17    not" that Defendant would be tortured, Dr. Boerman could only conclude that he would be "at risk"

18    of torture.  By way of contrast, in *Cole v. Holder*, 659 F.3d 762, 767, 773 (2011), the Ninth Circuit

19    remanded a CAT deferral claim where the petitioner's expert witness had stated that the petitioner

20    had "a 90% chance of being detained by the Honduran police and a greater than 75% chance of

21    being killed by gang members in Honduras because of his Crips tattoos."  Thus, regardless of

22    whether gang violence is sufficient to show the acquiescence of a public official, Defendant has not

23    put forth sufficient evidence to show that it is plausible an IJ in 2003 would have found it more

24    likely than not that Defendant would be subjected to torture by gangs if returned to El Salvador.

25                     ii.     Government Acquiescence

26    Even if Defendant had put forth sufficient evidence to show it plausible that an IJ would

27    have found it more likely than not that Defendant would be tortured by gangs if returned to El

28    Salvador, it is unclear how torture by gangs "is inflicted by or at the instigation of or with the

15

consent or acquiescence of a public official or other person acting in an official capacity." *See* 8 C.F.R. § 1208.18(a)(1).  A review of the law reveals that *no court* has found the requisite government acquiescence based on a similar fact pattern.  *See, e.g., Santos-Lemus v. Mukasey*, 542 F.3d 738, 747-48 (9th Cir. 2008); *Granados v. Ashcroft*, No. C-03-3704 MJJ, 2003 WL 22416417, at *10 (N.D. Cal. Oct. 15, 2003); *Menjivar v. Gonzales*, 416 F.3d 918, 922-23 (8th Cir. 2005) ("The newspaper articles at most demonstrate that the government has a problem controlling gang activity of which it is aware, but this is insufficient to compel a finding of the torture of citizens by third parties."); *Miah v. Mukasey*, 519 F.3d 784, 788-89 (8th Cir. 2008) (no willful blindness where government unable to control the activities of political figure's criminal gang); *Mayorga-Vidal v. Holder*, 675 F.3d 9, 19-20 (1st Cir. 2012) ("El Salvador's efforts at managing gang activity have not been completely effectual.  The record, however, does not compel a conclusion that the government has acquiesced in gang activities."); *Valdiviezo-Galdamez v. Attorney Gen. of U.S.*, 663 F.3d 582, 610 (3d Cir. 2011) (upholding denial of CAT relief, even where claimant had unsuccessfully sought police protection and evidence clearly supported that criminal gangs were a problem, because "the record also indicates that the government seeks to combat the problem and protect its citizens").

For example, in *Santos-Lemus*, the CAT claimant argued "that it [was] more likely than not he [would] be subject to torture upon returning to El Salvador because 'the police were unwilling or unable to protect him from gang violence and that very likely, the police themselves either cooperated with the Maras gang or were themselves members of this gang.'"  542 F.3d at 747-48.  The Ninth Circuit concluded that "it is undisputed that any torture [the claimant] fears would be committed by private individuals, not the government, and the Salvadoran government was not even aware that [the claimant] or his brothers had been targeted by the gang because the incidents were never reported and there [was] no evidence in the record suggesting the government may have otherwise been aware of threats made against [the claimant]."  *Id.* at 748.

At best, Defendant can point to two Ninth Circuit cases to have remanded for reconsideration by the BIA cases involving gang violence, *Aguilar-Ramos v. Holder*, 594 F.3d 701, 706 (9th Cir. 2010), and *Cole v. Holder*, 659 F.3d 762, 771-73 (9th Cir. 2011).  Yet, both remands were due to some combination of the BIA's failure to consider all evidence on the record and its failure to apply

the correct standard for showing government acquiescence, not because the court held that gang violence constituted torture. Moreover, both cases also involved some nexus to government action, as the petitioners feared torture by not only gangs, but also police and death squads as a result of the petitioners' tattoos.

In *Aguilar-Ramos*, in which the petitioner "expressed fear that police and gangs [would] harass, persecute, and kill him because his multiple tattoos and status as a deportee from the United States [would] mark him as a gang member," the Ninth Circuit remanded the case to the BIA based on its failure to consider the country report for El Salvador and failure to apply the correct legal standard for government acquiescence. 594 F.3d at 705-06. It concluded that because "[t]here [was] evidence in the record that suggest[ed] that gangs and death squads operate in El Salvador, and that its government is aware of and willfully blind to their existence," the district court should on remand consider whether the CAT claimant had satisfied the appropriate "awareness and willful blindness" standard. *Id.* at 703, 706. However, the only description of the evidence about gangs and death squads in *Aguilar-Ramos* is that the petitioner, because of his tattoos, was more likely to be targeted by gangs, police, and military and that he might face "death at the hands of death squads, which are comprised of off-duty police and military personnel and operate with the awareness of the government." *Id.* at 703. Thus, the petitioner had shown a nexus between his own circumstances, notably his tattoos, and the prospect of government action, and he did not rely on the prospect of gang violence alone. Moreover, the Ninth Circuit did not find that gang violence in those circumstances constituted government acquiescence, but rather directed the BIA to consider whether it did. *See id.* at 706.

In *Cole*, the petitioner sought CAT deferral because he believed his gang tattoos, race, general appearance, and accent would put him at heightened risk of torture "by gangs, police, or death squads" if he were deported to Honduras. *See id.* at 765-66. Moreover, he argued that the police would think he was a gang member because of his tattoos and thus either would not protect him or would expose him to torturous prison conditions. *See id.* at 766. Again, there was a nexus between the petitioner's circumstances – notably his tattoos, race, general appearance, and accent – and the prospect of government action or inaction. Moreover, the court drew a direct line between

17

the gang violence and the government, noting that "the Honduran police do not investigate the murders of gang members or suspected gang members." *Id.*

Here, Defendant primarily relies on three items on the record in support of his argument that a claim for CAT deferral was plausible in 2003: (1) his own declaration; (2) the declarations of his expert witness, Dr. Boerman; and (3) the U.S. Department of State country report on human rights practices in El Salvador. *See* Mot. 14-15, 20-21; Reply 8-12; Def.'s Supp. Br. 2-3, 5. However, none of these items establish any nexus between the likelihood of Plaintiff being tortured and the government.

First, Defendant's declaration is conspicuously silent on the role of the government in gang violence he and his family have faced in El Salvador. While he indicates that several family members were killed by gangs for failing to pay rent, he makes no mention of how public officials were involved in or acquiesced to such killings. *See* Parada Decl. ¶ 20. Defendant's explanation of his own experience upon return to El Salvador does not implicate any public official. Rather, he states that he was extorted by members of MS13 and 18th Street, as well as severely beaten and shot at by gang members. *See id.* ¶¶ 18-19. He does not claim that he made reports to police or other government officials who ignored them or that anyone in government was in any way involved in the incidents of gang violence he or his family suffered.

The Rivera declaration does contain some information regarding the police reaction to the murder of Defendant's cousins. She states, for example, that the police came to the scene of the first murder, but that they did not investigate any further because the police feared retaliation by the gang, and because there were corrupt members of the police force who were affiliated with the gang. Rivera Decl. ¶ 6. She notes that the police were aware of the murders of the two other cousins as well, but that they did not even open an investigation. Rivera Decl. ¶ 12. However, since Defendant has not identified a sufficient nexus between the murder of his cousins on the one hand, and any threat of gang violence directed at him on the other, indications that the police may have failed to investigate those murders is not sufficient to show that they would acquiesce in gang violence directed at Defendant.

1    Second, Dr. Boerman's declarations are too generalized to establish a nexus between the

2  government and the prospect of Defendant suffering gang violence, not providing any explanation

3  for why Defendant, as opposed to any other individual returning to El Salvador, would be tortured

4  with government acquiescence.  To show government acquiescence, Defendant relies entirely on a

5  portion of Dr. Boerman's second declaration, in which Dr. Boerman describes the implementation of

6  the gang-fighting strategy passed by the El Salvadoran legislature in 2003 known as the LAM or

7  "Mano Dura."  *See* Reply 10:1-18; Def.'s Supp. Br. 3:5-19.  Dr. Boerman states, in full, that

8
> 15.     In addition to Mano Dura's flawed conceptual underpinnings,
> actual implementation of the LAM was disjointed and wildly
> inconsistent.  On one hand, officers frequently rounded up known and
> suspected gang members but due to resource scarcity, indifference,
> ineptitude, and corruption at all levels of the PNC and judicial systems
> successful prosecutions rarely occurred.  On the other hand, because a
> significant percentage of police were in collusion with gangs, terrified
> of them, and/or indifferent toward the needs of the public, officers
> routinely avoided even entering gang-infested areas, or fled when the
> gangs appeared.
>
> 16.     Citizens and representatives from civil society have advised me
> that for all practical purposes during this period there was no
> meaningful police presence in gang-affected neighborhoods and that
> when contacted, police either did not respond at all or they failed to
> take action or engage in any investigative activities.  This was
> particularly true for citizens in the lower socio-economic classes, who
> represented the victims in the overwhelming majority of gang-related
> crimes.
>
> 17.     The judicial system in El Salvador was also completely
> incapable of responding to the gang phenomenon.  The combination of
> resource shortages, lack of training, intimidation, and corruption
> among prosecutors and judges resulted in a situation in which the
> government was virtually paralyzed in its ability to prosecute gang
> related matters.

22  Boerman 2d Decl. ¶¶ 15-17, Docket No. 19-1; *see also* Reply 10:1-18.  As a preliminary matter, this

23  declaration describes the subsequent implementation of a law that El Salvador had only passed in

24  2003, while Defendant would have had to present his CAT deferral claim based on the facts

25  available at the time of his 2003 deportation proceedings, which would in all likelihood have

26  predated the events described in this declaration.

27    More fundamentally, this declaration suggests that the government overall was trying to

28  combat gang violence, not acquiescing in it.  According to Dr. Boerman, the government *has* sought

19

to stop gang violence through its Mano Dura program, yet its efforts have been unsuccessful and even counterproductive. *See* Boerman 2d Decl. ¶¶ 15-17; Boerman 1st Decl. ¶¶ 12-19. While Dr. Boerman's declaration speaks to the Salvadoran government's general inability to combat gangs, courts have held evidence of government inability to address crime to not be enough to show government acquiescence. *See, e.g.*, *Mayorga-Vidal*, 675 F.3d at 19-20.

The only evidence cited by Defendant suggestive of government acquiescence in torture is Dr. Boerman's conclusory statements that "a significant percentage of police were in collusion with gangs, terrified of them, and/or indifferent toward the needs of the public" and that "[c]itizens and representatives from civil society have advised [Dr. Boerman] . . . that when contacted, police either did not respond at all or they failed to take action or engage in any investigative activities." *See* Boerman 2d Decl. ¶¶ 15-16. However, Defendant does not connect the dots between how these general assertions could lead to the plausible conclusion that it was more likely than not that, in 2003, Plaintiff would have been tortured with the government's acquiescence. If Dr. Boerman's broad conclusions were sufficient, virtually all gang violence in El Salvador would constitute torture. While it is conceivable that police collusion with gangs could be so endemic across a country or within a particular region of a country that any gang violence would be presumptively done with the acquiescence of the government, the threshold for such a finding must be high. Here, Dr. Boerman's conclusions are too vague and conclusory to support such a finding; he does not indicate what a "significant percentage" of the police constitutes nor does he provide any quantitative analysis or direct observations of when police do not adequately respond to complaints about gangs. Thus, Dr. Boerman's declarations do not suffice to show government acquiescence.

Third, Defendant cites the U.S. Department of State country report on human rights practices in El Salvador for various facts showing government corruption in El Salvador, but only two such facts potentially speak to the interaction between any public officials and gangs: that fifteen to twenty gang members were implicated in the death of a member of the FMLN, by then a political party as opposed to a guerrilla group, and that the FMLN used gangs for political purposes. *See* Def.'s Supp. Br., Docket No. 22, at 5:13-23 (citing Kang Decl. Ex. 5). However, a closer examination of the cited report reveals that these two facts do not show any government

acquiescence in gang violence. First, the fifteen to twenty gang members implicated in the death of a member of the FMLN were explicitly *not* affiliated with the FMLN's rival political party, ARENA, and the country report does not suggest any government acquiescence in their acts. *See* Kang Decl. Ex. 5 at 2. Second, while the FMLN is alleged to have used gangs for political purposes, the only example of such use is that gangs "paint[ed] walls for the presidential elections . . . ." *See id.* at 3. Ultimately, none of the facts from the Department of State report cited by Defendant show government acquiescence to gang violence.

In short, given the wealth of authority showing that inept government response to gang violence does not constitute acquiescence and Defendant's failure to put forth specific evidence suggesting why it was more likely than not in 2003 that he would have been subject to torture by gangs with government acquiescence, Defendant has not set forth sufficient evidence to show that he had a plausible claim for CAT deferral, and the Court **DENIES** his motion to dismiss the indictment.

## IV.    CONCLUSION

As Defendant has not shown that he had a plausible claim for CAT deferral in 2003, the Court **DENIES** his motion to dismiss the indictment in this case.

This order disposes of Docket No. 11.


IT IS SO ORDERED.


Dated: June 21, 2013


_____
EDWARD M. CHEN
United States District Judge